Filed 10/10/14  G.Z. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| G.Z. et al,<br><br>   Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF MONTEREY COUNTY,<br><br>   Respondent,<br><br>MONTEREY COUNTY DEPARTMENT OF SOCIAL & EMPLOYMENT SERVICES,<br><br>   Real Party in Interest. | H041186<br>(Monterey County Super. Ct. Nos. J47163 and J47164) |

N.H. and A.H. (collectively, Children) were taken into protective custody on April 19, 2013 and soon thereafter declared dependents of the juvenile court.  G.Z. (Mother) and Children have filed petitions for writ of mandate in this court challenging the juvenile court's June 30, 2014 orders terminating Mother's family reunification services and setting a selection and implementation hearing under Welfare and Institutions Code section 366.26.[1]  Concluding that substantial evidence supports the juvenile court's findings, we will uphold the termination order and deny the petitions.

_____

[1]  All statutory references are to the Welfare and Institutions Code.

1

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  OVERVIEW

Mother has five children.  N.H. was born in September 2010, and his brother, A.H., was born in November 2012.  Children have an older half-brother, E.Z., who recently turned 14, and 16- and 17-year-old half sisters.  Mother married the father of the three older children in 2001, and they have remained married even though they separated in 2003.  Since 2006, the maternal grandmother has had legal guardianship over the girls.

Mother has a long history of alcohol and methamphetamine abuse, and a criminal history including three felony controlled substance convictions and a misdemeanor conviction for driving under the influence.  She also has a 2012 conviction for corporal injury to a child, an offense involving her younger daughter for which she has been on probation throughout this dependency action.

Mother used alcohol and methamphetamine during her first trimester of pregnancy with N.H.  As an infant, N.H. suffered from vomiting and weight loss and was diagnosed with gastroenteritis and failure to thrive.  Mother was incarcerated in late 2011 and N.H. was cared for by a family friend for several months.  During that time period, N.H. was diagnosed with developmental delays in speech, language, and motor skills.  He started speech and language therapy and received Early Start services while in the friend's care.

In April 2012, Mother left an in-patient substance abuse program and reconnected with N.H.'s father upon his release from prison.  Mother became pregnant with A.H. and was hospitalized at 25 weeks.  She delivered at 27 weeks and resumed her substance abuse.  A.H. was born with retinopathy of prematurity, esophageal reflux, and a heart murmur, conditions attributable to fetal drug and alcohol exposure.  N.H. returned to Mother's care in early 2013, shortly before this dependency action commenced.

## B.  DEPENDENCY PROCEEDINGS

On April 19, 2013, the Monterey County Department of Social and Employment Services (the Department) filed juvenile dependency petitions on behalf of N.H. and

A.H., alleging that Mother had failed to protect and provide for Children.[2]  The petitions alleged that a social worker visited Mother on April 16 and observed that she was neglecting Children.  Children had urine saturated and soiled diapers which Mother blamed on E.Z.  Mother's priorities were focused on her probation, and she appeared overwhelmed with her parenting responsibilities.  A month earlier, the Department had received a call from Stanford Hospital because Mother had missed a treatment appointment for A.H.'s potentially serious eye condition.  On April 17, after Department staff met with Mother, Children's maternal grandmother, and service providers, Children were taken into protective custody and later placed in foster care with Mother's second cousin.

At the June 5, 2013, uncontested jurisdiction and disposition hearing, the juvenile court found the allegations in the petitions to be true, declared Children dependents of the court, and committed them to the care and custody of the Department.  The court ordered family reunification services for Mother and approved the Department's reunification case plan.[3]  That plan required Mother to address her substance abuse and participate in parenting classes, scheduled visitation with Children, and counseling.

## C.    THE SIX-MONTH STATUS REVIEW

The social worker reported that N.H. had been medically diagnosed with fetal alcohol syndrome, and expressive language and fine motor delay.  N.H. missed his mother, and he had some behavioral issues adjusting to a new babysitter when his foster mother returned to work after the summer break.  A.H. was seen for a small atrial septal defect, a minor pulmonary valve abnormality, and a closed ventricular septal defect.  He

---

[2]  The Department also filed a petition on behalf of mother's older son, E.Z.  That matter is not before this court and we do not discuss it here.

[3]  Reunification services also were offered to the children's father, but he never contacted the Department and his services were terminated at the six-month review hearing.

3

also was diagnosed with gatroesophogeal reflux and had been referred for a developmental delay assessment.

Mother, who had relapsed almost immediately after graduating from an outpatient drug treatment program in July 2013, had completed four months of substance abuse treatment at the Door to Hope residential treatment program. Mother had been participating in therapy, supervised visits with Children, and parenting classes. The social worker reported that the return of Children to Mother's custody at the six-month mark would not be appropriate because Mother was in the very early stages of recovery, she did not have appropriate housing, and she needed to learn how to meet Children's special needs. Although the social worker opined that the probability of Children returning to Mother's home was unknown and that Mother "[had] a great deal of work ahead of her," she recognized that Mother had been able to maintain her sobriety and she recommended that Mother's family reunification services continue.

At the six-month review hearing, Mother, who was living in her mother's home, was planning to enter another residential recovery home, get a job, and save money for her own housing. The matter was submitted on the social worker's report, Mother's reunification services were continued, and a case plan update was approved with a June 4, 2014 projected completion date. The case plan requires that Mother maintain sobriety, develop and demonstrate awareness of age appropriate expectations for Children, and develop and demonstrate her ability to identify and meet Children's physical, emotional, medical, and educational needs. To that end, Mother was to actively participate in visitation sessions with the Parents as Teachers coaches. Mother was required to regularly attend and participate in counseling to develop "the ability to understand [Children's] feelings and needs" and "the ability to be responsive" to those needs.

4

**D.** **THE TWELVE-MONTH STATUS REVIEW REPORT**

The Department filed its 12-month status review report on May 23, 2014, in preparation for a June 3 permanency review hearing.[4] The social worker reported that Mother, who had maintained her sobriety, was living in a homeless shelter in Salinas and working full time for a cleaning company. Mother had been attending therapy fairly consistently, and in February had begun to make some genuine progress. She had completed the Kickstart ex-offender employment re-entry program on February 21, and completed an eight-week parenting course on March 13. The social worker acknowledged Mother's efforts to become more independent by moving from her mother's home to the Salinas shelter and by taking the bus instead of relying on others for transportation. In March, Mother reported that she was no longer in contact with Children's father, who was her biggest trigger for relapse.

At a team decision meeting in April, Mother inquired about the visitation schedule if Children were to remain with the foster family. The social worker reported that Mother still struggled with meeting Children's special needs, and that outside of her sobriety, her progress had been superficial. Mother had minimized her drug and alcohol use at that meeting, demonstrating her failure to take responsibility and fully understand the impact her drug abuse had on Children's development.

N.H. underwent an extensive developmental evaluation in early 2014 with the Monterey County Screening Team for Assessment, Referral, and Treatment (MCSTART), and the results of that evaluation were attached to the report. The evaluation showed that N.H. was "delayed in the acquisition of pre-academic skills, and social skills such as using manners, helping others, and recognizing emotions" as a result of reactive attachment disorder. That disorder is associated with cognition and language developmental delays, and medical symptoms of severe neglect. The MCSTART

---

[4] That hearing was contested by mother and continued to June 30, 2014.

psychologist opined that N.H. needed permanency in his life, and his permanent caregiver would need to engage N.H. in up to two years of attachment-based therapy for N.H. to overcome his early neglect. N.H. would require a structured environment, need adult assistance in forming friendships and developing appropriate social skills with children his age, and need help developing emotional language to verbally express his feelings and process his emotions.

The MCSTART evaluation identified a neurodevelopment disorder associated with N.H.'s fetal alcohol syndrome. That disorder impedes brain development and puts N.H. at risk for learning and behavioral difficulties. For N.H. to reach full development potential, the psychologist explained: "[I]t is imperative that [N.H.] is in a stable, loving home with caregivers who are committed to working with him to foster an attachment relationship, and can support his emotional and academic needs."

The psychologist wrote that N.H.'s prenatal substance abuse, medical history, and traumatic family experiences likely will require long-term support including counseling through childhood and adolescence, educational support such as tutoring to address any learning disabilities, structured summer programs, and regular parental consultation with professionals specializing in developmental, emotional, and behavioral needs of neglected children, and in children with neurodevelopment disorders.

The social worker reported the results of a Stanford High Risk Infant Program assessment for A.H. The examining medical doctor diagnosed A.H. with development delay in language and fine motor skills, and recommended that an infant development specialist visit with A.H. weekly. The doctor recommended diagnostic testing of A.H.'s sacrum, follow up for a detected heart murmur, and an audiology examination. A.H. also was diagnosed with microcephaly.

Mother had had regular visits with Children and had consistently worked with the Parents as Teachers coaches during those visits. However, Mother's visits had remained supervised because of her inability to set and adhere to limits with N.H. N.H. did not

6

always listen to Mother or take Mother's directions seriously, and it was thought that his safety would be at risk if Mother's visits were unsupervised. Instead of managing N.H.'s behavior using her newly-acquired parenting skills, Mother elected to keep N.H. occupied with movies during their visits.

The social worker concluded that returning Children to Mother's physical custody would create a substantial risk of detriment to Children's safety, protection, and well being because (1) visits with Children had not progressed to unsupervised; (2) Mother had not demonstrated her ability to meet Children's special needs, to set limits and follow through with those limits, or to understand the severity of Children's special needs; and (3) Mother did not have housing to accommodate Children and their special needs.

The Department recommended that family reunification services be terminated because Mother had not demonstrated her ability to implement the knowledge or skills required to meet Children's special needs even if services were extended another six months.

E.  THE PERMANENCY HEARING

1.  Social Worker Testimony

The social worker testified consistent with the 12-month status review report, which was admitted into evidence without objection. Although 21-month-old A.H. did not have any psychological issues, he was exposed to alcohol and methamphetamine in utero, born premature, and had been a high risk infant. His medical conditions require follow up care and on-going visits with an occupational therapist. The social worker also testified to N.H.'s severe fetal alcohol syndrome, reactive attachment disorder, and developmental evaluation.

The social worker explained that Mother was never able to transition to unsupervised visits with Children because she was unable to keep them safe without supervision. Because of his fetal alcohol syndrome, N.H. needs very high structure and attention; a caregiver must be "hands on," "explain things," and "go to [N.H.]" when he

7

is doing something unsafe. Mother's difficulty following through with limit setting was confusing to N.H, and it "led to him saying he didn't want to visit mom because it was too stressful for him."

Many of the visits were assisted by the hands-on Parents as Teachers coaches, who would teach Mother how to respond to boundary issues and safety concerns. Although the coaches had been very helpful, particularly with N.H., the visits were challenging when the coaches were absent. For example, N.H. had a "meltdown" at Burger King attributable to Mother's failure to follow through with limits, and N.H. had recently taken a hard fall because Mother did not react appropriately to his reckless play. Mother recently had reported that N.H. had run away from her. Mother had been visiting with Children for two hours three days a week. After the Department decided to recommend that services be terminated, Mother asked for separate visits with N.H., resulting in her spending one visit per week with Children together, and the other visits with each child separately. After 14 months of reunification services, Mother's visits would need to be unsupervised, not bifurcated, in order for a timely transition from foster care to Mother's home to occur.

The social worker testified that Mother was not in a position to care for Children's special needs because she could not safely care for Children without supervision and because she had boundary issues, addictive behaviors attributable to her drug addiction, and she was still unable to put Children's needs first. The social worker cited as one example that Mother had cut a visit short by one-half hour because she did not want to wait for a bus. Mother's therapy attendance had been inconsistent, and Mother had missed several appointments. Ultimately, Mother had not made "genuine progress to internalize [*sic*] and become independent."

Mother was not close to obtaining housing for herself and Children. In early 2014, Mother moved from her mother's home to a shelter in Salinas to save money for her own housing. In May 2014, shelter staff informed the social worker that they were having

8

difficulty with Mother not following the shelter's rules, and Mother was asked to leave. She moved to the Victory Outreach shelter in Soledad where she was living at the time of the hearing.

In light of Mother being clean and sober at the six-month review hearing, the social worker had hoped another six months would allow Mother to progress with her other issues. But the social worker did not see a substantial probability that Mother would be able to care for Children by the October 2014 18-month extended reunification deadline. In the social worker's opinion, Mother did not have the capacity to meet her own needs, much less understand the needs of Children. Children with fetal alcohol syndrome need very high structure, and Mother would not be able to provide that structure.

### 2. Parent-Educator's Testimony

A "parent educator" had been coaching Mother during her supervised visits for 11 months, originally every other week with Children and more recently weekly with N.H. They were working on establishing a routine, setting limits, and reading N.H.'s cues, skills that Mother had been having difficulty with. The parent educator explained that Mother's consistency with setting limits had improved. Although N.H. had arrived at two or three recent visits not wanting to see Mother, Mother told the parent educator that N.H. was upset about something that had happened at an earlier visit. The parent educator never lobbied for or discussed unsupervised visits with the social worker.

### 3. Mother's Testimony

Mother had had a change of attitude in the preceding six months and she wanted to reunify with Children. She had been sober for 11 months, she had a sponsor, and she had been working the AA steps. Her visits with Children had changed because she understood the importance of consistency and setting limits with N.H. She had taken several parenting classes, she could see and read Children's clues, and she could help N.H. with his anger and tantrums. She acknowledged that giving in to N.H. the day he

9

had a "meltdown" was a mistake and that she should have proactively prevented N.H. from falling. Individual therapy, which she regularly attended, and group therapy attended at the domestic violence shelter had helped her confront her feelings. When asked whether she had missed the last few therapy sessions, she said that one of those sessions had been cancelled by her therapist.

Mother had a job interview scheduled for a clerk position at the Soledad Library, and she would be eligible for a housing subsidy in the form of first month's rent plus deposit should she become employed and find housing.

### 4. Juvenile Court Ruling

The juvenile court found that Mother had not made substantive progress with her service plan and that returning either child to her care would create substantial risk or detriment to that child's safety. Mother had not shown the ability to care for Children who had special needs. The court found by clear and convincing evidence that the Department had provided reasonable reunification services and that there was not a substantial probability that Children would be able to be returned to Mother safely within the extended 18-month reunification period. The court adopted the Department's recommended findings, terminated reunification services, and scheduled a selection and implementation hearing for October 21, 2014. The court commended Mother for maintaining her sobriety and consistently visiting with Children. But it observed that this case had not timely progressed to achieve reunification. With three and one-half months remaining, the parent should be engaged in unsupervised visits, including weekend and extended visits, to transition a child back to the care of the parent.

Mother and Children filed notices of intent to challenge the court's June 30 termination orders. (See Cal. Rules of Court, rule 8.450.) Children filed a joint petition for a writ of mandate in this court on August 1, 2014, and Mother filed her petition three days later fully incorporating "the legal argument and legal authority" advanced by

10

Children.  (See Cal. Rules of Court, rule 8.452.)  The Department filed a brief in opposition on August 19.

## II.  DISCUSSION

**A.  LEGAL PRINCIPLES**

" 'Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.]  Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible."  [Citation.]' (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787.)  Reunification services are typically understood as a benefit provided to parents, because services enable them to demonstrate parental fitness and so regain custody of their dependent children.  [Citation.]" (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1228.)

If a child is under the age of three on the date of his or her initial removal from the physical custody of his or her parent, the court is required to order family reunification services "for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care … unless the child is returned" home.  (§ 361.5, subd. (a)(1)(B).)  At the six-month review hearing, the court may continue the case to a twelve-month permanency hearing if it finds there is a substantial probability that the child may be returned to his or her parent within another six months or that reasonable services have not been provided.  (§ 366.21, subd. (e).)

At the twelve-month permanency hearing, the court must determine whether "the return of the child to his or her parent … would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child," and whether the parent was offered or provided with reasonable services to aid the parent in overcoming the problems that lead to the Department's removal and continued custody of the child. (§ 366.21, subd. (f).)  If the court finds a substantial risk of detriment, it shall continue the

11

matter again, but only for the remainder of the 18-month period following the child's initial removal and only if it finds "a substantial probability that the child will be returned to the physical custody of his or her parent … and safely maintained in the home within the extended time period" or that reasonable services have not been provided to the parent.  (§ 366.21, subd. (g)(1).)  Otherwise, barring exceptions not present here (§ 366.21, subd. (g)(2), (5)), the court shall terminate reunification services and order that a hearing be set within 120 days pursuant to section 366.26.  (§ 366.21, subds. (g)(4), (h).)

"[T]o find a substantial probability that the child will be returned to the physical custody of his or her parent … and safely maintained in the home within the extended period of time," the court is required to find:  "(A) That the parent … has consistently and regularly contacted and visited with the child.  ¶  (B) That the parent … has made significant progress in resolving problems that led to the child's removal from the home.  ¶  (C) The parent … has demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1)(A)-(C).)

B.    STANDARD OF REVIEW

We review the juvenile court's order terminating reunification services under section 366.21 for substantial evidence.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688 [no substantial probability child will be returned within extended time period]; *In re Mario C*. (1990) 226 Cal.App.3d 599, 605 [reasonable reunification services]; see also *In re Jasmine C*. (1999) 70 Cal.App.4th 71, 75 [substantial evidence review applies even when trial court's standard of proof is clear and convincing evidence].)

We review the record in the light most favorable to the court's findings, and we draw all reasonable inferences from the evidence to support the disposition.  (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.)  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to

12

support the findings of the trial court." (*In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.)  In reviewing the reasonableness of reunification services, "[t]he standard is not whether the services … were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R*. (1991) 2 Cal.App.4th 538, 547.)

## C.     NO SUBSTANTIAL PROBABILITY OF RETURN

Petitioners argue that Mother meets the requirements set forth in section 366.21, subdivision (g)(1) to extend reunification services to the 18-month statutory deadline. They further argue that substantial evidence does not support the termination order because Mother has made substantial progress with her reunification case plan. Petitioners point to Mother's successful completion of a substance abuse treatment program, her one year of sobriety, and her on-going work with a sponsor.  They point to Mother's progress in therapy and in developing and practicing parenting skills, including her acknowledgment of mistakes.

While petitioners have provided an exhaustive list of Mother's accomplishments over the course of this dependency action, our task is not to reweigh the evidence but to determine whether the record contains sufficient facts to support the juvenile court's findings.  (*In re Matthew S*., *supra*, 201 Cal.App.3d at p. 321.)  Here the court found that there was "not a substantial probability that [Children] will be returned to the physical custody of [Mother] and be safely maintained in the home at or before the expiration of 18 months from the date of [Children's] initial removal."  That finding is supported by substantial evidence.

The 12-month status review report, admitted into evidence without objection, stated that Mother's visits with Children have been unable to progress to unsupervised and Mother has not demonstrated the ability to meet her Children's special needs, including the ability to set and follow through with limits.  (See § 366.21, subd. (g)(1)(B)-(C).)  Mother recently had asked for separate visits with N.H., demonstrating

13

her continued challenge, even with assistance, caring for her Children. The parenting coach had not recommended unsupervised visits, and normally, with less than four months remaining to reunify, a parent would be prepared for extended unsupervised visits to ensure a child's timely transition to the Mother's care. This evidence supports the court's finding that there was not a substantial probability that Mother would have been able to safely maintain Children in her home by the reunification deadline.

Mother's inability to secure or maintain housing and employment also supports the court's no substantial probability finding. (See § 366.21, subd. (g)(1)(B)-(C).) After graduating from Door to Hope, Mother had planned to transition to another residential treatment facility, start working, and save money for housing. Sometime after the new year she moved to a Salinas shelter and obtained full-time employment with a cleaning company. But apparently that job, and Mother's stay at the shelter, were short lived. Mother was asked to leave the shelter because she was being manipulative and not following rules. At the June 30 permanency placement hearing, Mother was looking for a new job and hoping for a housing subsidy that was contingent upon employment. While Mother had secured an employment interview with the Soledad library, she failed to keep her cleaning job in the interim, and she failed to maintain her welcome at the Salinas shelter, demonstrating the lack of a substantial probability that she would be able to safely care for Children and meet their needs by the extended reunification period.

### D.    REASONABLE REUNIFICATION SERVICES

Petitioners argue that Mother's reunification services were deficient because Mother and N.H. were not offered therapy to address N.H.'s reactive attachment disorder. The MCSTART psychologist had advised that N.H. would need two years of intensive therapy with his permanent caregiver to overcome the nonattachment attributable to Mother's failure to provide for N.H. Here, the services were reasonable under the circumstances. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) Intensive therapy was recommended for N.H. and his permanent caregiver. It would have been premature and

14

inappropriate for Mother and N.H. to begin that therapy before reunification had actually occurred. That therapy will be appropriate with N.H.'s permanent caregiver as soon as that caregiver is identified at the selection and implementation hearing.

Petitioners also argue that Mother should have been offered services including developmental instruction on the "physical, psychological, emotional and academic limits and potential [of a child with reactive attachment disorder] so that the mother could learn how best to raise her child." Evidence in the record shows that consistency and structure are essential to parenting a child with N.H.'s needs, and Mother testified that she understood these requirements. The Department offered mental health counseling, parenting classes, and supervised visitation with parent coaches to assist Mother with these skills. Here again, these services were reasonable under the circumstances. (§ 366.21, subd. (f) [reasonable services are "designed to aid the parent … to overcome the problems that led to the initial removal and continued custody of the child."].) Family reunification services were not terminated because Mother had not learned everything she would need to know to raise N.H. to "reach his highest potential psychologically, emotionally and academically." Services were terminated because Mother was unable to provide the threshold consistency and structure to safely provide and care for N.H., and substantial evidence supports that determination.

Similarly, petitioners argue that reunification services were deficient regarding A.H. because Mother was not offered services to teach her how to raise a child with microcephaly. But A.H. was placed in the Department's custody because of Mother's neglect, not because A.H. had microcephaly. Reasonable services include services to assist Mother in overcoming her neglect. Substantial evidence supports the juvenile court's finding that the Department provided those services.

15

## III.  DISPOSITION

The petitions for writ of mandate are denied.  Mother's request for a stay of the 18-month statutory reunification period pending our disposition of this matter is denied as moot.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.